Walter J. POWELL, Plaintiff,

v.

CITY OF PITTSFIELD, Edward M. Reilly, and Kathleen Alexander, Defendants.

No. CIV.A.97–30189 MAP.

United States District Court, D. Massachusetts.

Aug. 21, 2002.

David P. Hoose, Howard S. Sasson, Katz, Sasson & Hoose, Springfield, MA, for Plaintiff.

Judith C. Knight, Campoli & Curley, Katherine G. Alexander, Pittsfield, MA, Daniel R. Solin, New York City, David B. Mongue, Donovan & O'Connor, Adams, MA, Nancy Frankel Pelletier, Robinson, Donovan, Madden & Barry, Springfield, MA, John A. Agostini, Pittsfield, MA, for Defendants.

## MEMORANDUM OF DECISION

PONSOR, District Judge.

### I. INTRODUCTION

On September 29, 1993, plaintiff Walter Powell, an African–American police officer, settled a lawsuit alleging racial discrimination against the City of Pittsfield. This settlement called for a payment of $81,000 and Powell's reinstatement to the Pittsfield police department. Following the settlement, the defendants began a campaign of obstruction, choreographed by the City Solicitor, designed to pressure or manipulate Powell into abandoning his plan to return to the police force. For more than two and a half years defendants managed to fend off plaintiff's return with excuses they knew were false, forcing Powell to cobble together ways to support himself and his family while he waited. Finally, on May 20, 1996, after Powell filed a *pro se* motion to vacate the 1993 Settlement Agreement, the defendants dropped their campaign and allowed him to return to work, as they had originally promised.

Our constitutional system gives every citizen the right to seek redress in the courts, as Walter Powell did, without fear that recourse to the law will make that citizen a target for retaliation, as Walter Power was here. Defendants' misconduct entitles Powell to substantial damages for his lost wages and emotional distress. In

addition, the court will award punitive damages against the City Solicitor for her particularly egregious misconduct. Plaintiff will also be entitled to full reimbursement of his reasonable attorneys' fees.

The specific counts remaining against the three defendants now before the court are as follows.[1]

Powell alleges (1) that defendants delayed his reinstatement in retaliation for his successful 1991 lawsuit, in violation of 42 U.S.C. § 1983 (Count II); (2) that Pittsfield exploited the fact that Powell suffered from hepatitis C as a false justification to delay his return, in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count III); (3) that the individual defendants conspired to retaliate against him, in violation of 42 U.S.C. § 1985(2) (Count IV); and (4) that the City of Pittsfield's refusal to comply with the settlement agreement constituted a common law breach of contract (Count V).

## II. *FINDINGS OF FACT*

1. Powell is married, but was separated at the time of trial. He was born in North Carolina. He is currently 49 years old, and has children ages 30, 25, 24, 21, and 2. Powell was a medic with the 82nd Airborne Division of the United States Army, and received an honorable discharge in 1976. Before beginning his employment as a police officer, Powell worked, among other fields, with the carpenter's union.

2. In December, 1983, Powell became a police officer in North Adams. In 1985, Powell transferred to Pittsfield and began employment there. Pittsfield was a larger department, and Powell believed that there would be more room to advance. In connection with this transfer, Dr. Gordon T. Bird ("Dr.Bird"), the City's physician,

performed a routine physical examination on Powell, but it was less extensive than the physical given to new recruits.

3. On March 21, 1991, Powell was fired from the Pittsfield Police Department. Powell hired an attorney, Kenneth Gogel ("Gogel"), and brought suit against Pittsfield, the former Chief of Police, the former Mayor and others, alleging racial discrimination.

4. This 1991 Complaint was offensive to the police department. It charged Captain Walter M. Boyer, the Acting Chief of Police at the time, with "calling a black man a nigger," in the presence of two police trainees. It also alleged that Captain Boyer said that he "would run his ass over if a black man stepped in front of the cruiser." In addition to Attorney Gogel, who was handling the lawsuit, Powell was represented by Attorney Michael Powers ("Powers") in Boston on a related Civil Service matter involving the City of Pittsfield.

5. In 1992, while the suit was pending, Reilly was elected as Mayor of Pittsfield. Reilly appointed Kathleen Alexander as City Solicitor. When she started, the solicitor's office was in bad shape. There was a huge number of cases, and files were on the floor. Alexander had been a general litigator and had no experience in municipal law. She was working 12–15 hours per day, 6 days a week, and had only one half-time assistant. Due to her efforts, the organization and professionalism of the Solicitor's office quickly improved.

6. Reilly also appointed Gerald Lee as Chief of Police ("Lee" or "Chief Lee"). Chief Lee had been a police officer since 1969, had worked with Powell, and admit-

---

1. The court has previously entered summary judgment in favor defendants Gerald Lee and Gordon Bird on all counts against them. Partial summary judgment was granted with re-gard to some but not all of the counts against the remaining three defendants. *See Powell v. City of Pittsfield,* 143 F.Supp.2d 94 (D.Mass. 2001).

ted having a close relationship with some of the defendants that Powell sued.

7. The 1991 litigation created negative publicity. Mayor Reilly was aware of this and consequently undertook to settle Powell's suit. Reilly believed that the City could not be run well in a contentious way, and that the Powell litigation was "divisive to the City." Chief Lee agreed that the suits were divisive.

8. Reilly also believed that Powell had been unfairly fired and thought it was "fair" for Powell to get his job back. Reilly delegated the efforts to settle Powell's lawsuit to Alexander, although he remained involved to some extent. Gogel did not participate directly in the settlement negotiations (although they covered the action he was handling), which were handled by Attorney Powers on Powell's behalf and included the related Civil Service matter as well. Alexander had a troubled relationship with Attorney Powers.

9. In June of 1993, Powell wrote directly to Alexander and asked about her response to his letter threatening further suit. Alexander would have had to defend that threatened suit if Powell had followed through. Alexander was also representing the City in the related ongoing Civil Service matter in Suffolk County.

10. Several police officers had "hard feelings" against Powell as a result of his lawsuit and made these feelings known to Chief Lee, Alexander, and Reilly.

11. Powell entered into a Settlement Agreement with Pittsfield on September 29, 1993. The settlement document was signed by Powers, Powell, and Alexander. No City representative other than Alexander signed the agreement, but prior to entering the Agreement, Reilly and Alexander met with Chief Lee to discuss the requirements to be satisfied by Powell as a condition of his reinstatement. Under the terms of the Settlement Agreement, Powell agreed to:

(1) dismiss his suits with prejudice; and

(2) issue a joint media statement with Pittsfield and otherwise keep the Agreement confidential.

Pittsfield agreed to:

(1) pay Powell $81,000; and

(2) reinstate Powell subject to:

1. "certain retraining;"

2. "certain psychological counseling if and as determined by Chief Lee;"

3. "successfully undergoing a complete physical and psychological examination;" and

4. "whatever other conditions Chief Lee determines are necessary in order to facilitate Mr. Powell's reorientation into the Department for both his own interests and the best interests of the Department."

12. Powell did not understand "certain retraining" to include going to the Massachusetts Police Academy. Powell had already completed academy training in 1983 prior to joining the North Adams police department. Reilly also testified that he had no recollection, one way or the other, of the requirement that Powell attend the academy. However, Gogel testified on cross-examination that he did understand that Powell would have to re-attend the academy before reinstatement. Chief Lee testified that he contacted the Criminal Justice Training Council, and they sent him a letter recommending that Powell go to the academy in the fall of 1993.

13. On October 20, 1993, Dr. Bird examined Powell. Despite the fact that Powell had previously been a police officer, the City had requested that Powell be examined as "a new recruit," and told Dr. Bird that Powell would be re-attending the academy. Treating Powell as a new recruit required Dr. Bird to administer tests that he otherwise would not have conducted.

14. Dr. Bird was the City Physician, and had previously seen Powell two or three times for problems related to routine illness or injury.

15. Dr. Bird found Powell to be healthy and muscular, if somewhat overweight. At the time, Powell was bench pressing over 300 pounds and running five miles approximately three times a week. At this initial exam, Dr. Bird found no indication that Powell could not return to work. The lab tests, however, showed a mildly abnormal elevation in liver function.

16. When Dr. Bird informed Powell of the liver test results, Powell asked, "Are you saying there is a problem with me going back to work?" Dr. Bird replied, "No, I'm not saying that." Dr. Bird put a check on the disposition form indicating that Powell was "qualified for the position sought," but added an asterisk, noting that Powell had abnormal liver functions and needed further testing. Dr. Bird felt that the initial elevations in liver function were non-diagnostic. He also found Powell to be completely asymptomatic.

17. On the basis of further tests, taken on or about October 29, 1993, Dr. Bird recommended that Powell have a hepatitis panel test to further assess his liver function. On November 10, 1993, the panel test indicated a positive reaction for hepatitis C. This was exactly six weeks after the Settlement Agreement was signed. Dr. Bird testified that he was not aware of any other officer or other employee disqualified because of hepatitis C.

18. On November 10, 1993 (the same day that Powell was found to have hepatitis C) Alexander, Reilly, and Chief Lee met and discussed Powell. All three were aware that there was hostility and "bad feelings" against Powell among members of the police force because of Powell's prior lawsuit. At the meeting, Reilly asked if they could retire Powell "involuntarily," and queried whether Powell had a "disabl-ing condition." In Chief Lee's words, if Powell had taken disability retirement, it would have "solved a lot of problems."

19. Based on the totality of the evidence, the court finds that at this November 10, 1993 meeting, Alexander, Reilly, and Chief Lee agreed to attempt to steer Powell towards a disability retirement to avoid possible discord if Powell returned to active duty as a police officer. Their goal was to avoid friction arising from hostility within the ranks over Powell's 1991 lawsuit.

20. On November 15, 1993, Powell went to see his own physician, Dr. Robert Taylor ("Dr.Taylor"). Powell was distrustful of Dr. Bird because he had not been received back into the department, even though Dr. Bird had told him that the elevated liver function would not prevent him from returning to work. Dr. Taylor found (apparently incorrectly) that Powell had hepatitis B with no symptomatology, and should have no "professional restrictions or limitations whatsoever." This letter was sent to Alexander. On November 24, 1993, Powell went to see Dr. Bird again, with Dr. Taylor's report in hand. Dr. Bird told Powell that he needed to see Dr. Arthur H. Wasser ("Dr.Wasser"), a gastroenterologist.

21. On December 1, 1993, Powell applied for and received a license to operate his 1986 Cadillac as a taxi. At this time, he had been "subbing" as a taxi driver on an as-needed basis for a month or two. Powell got this license in order to pay the bills; the taxi work paid a "fraction" of what Powell earned as a police officer, and Powell would have preferred to work as a police officer. With no income, he had no choice but to find a way to support himself and his family.

22. On December 9, 1993, Attorney Powers sent a letter to Powell, confirming that Powers was sending Dr. Taylor's re-

port to Alexander. Powers recommended to Powell that he see Dr. Wasser and have the recommended diagnostic tests. The tone of the December 9 Attorney Powers' letter to Powell was rather brusque and dictatorial. Powell fired Powers sometime soon thereafter because he was not satisfied with Powers' representation and did not believe that Powers was pushing hard enough to get him back to work.

23. On December 9, 1993, Dr. Wasser saw Powell. In a report dated December 13, 1993, Dr. Wasser informed Dr. Bird that Powell was "completely asymptomatic and has been leading a healthy and vigorous life." Powell's "physical examination was essentially negative." Dr. Wasser reported that Powell was "a healthy, strapping man with a normal blood pressure . . . ." Powell's liver was not palpable, and "there were no masses or tenderness." Dr. Wasser *diagnosed* Powell with "a form of chronic active hepatitis, probably hepatitis C." Dr. Wasser then discussed Powell's "prognosis and treatment recommendations" and "the risk Mr. Powell pose[d] for transmission of the disease." Dr. Wasser suggested (1) an RIBA antibody test for a "definitive diagnosis of hepatitis C;" (2) a "viral RNA by PCR" "to determine infectivity and activity of virus;" and (3) a liver biopsy "to determine the extent of disease histologically on this patient." The liver biopsy was recommended by Dr. Wasser only for purposes of treatment, not for purposes of diagnosis. The Wasser report said the risk to family members and co-workers was "rather low." Dr. Wasser suggested that transmission would require "intimate sexual exposure," or "a needle stick or transmission of bodily fluid in large amounts."

24. On December 15, 1993, Dr. Bird wrote a letter to Powell in response to Powell's queries regarding (1) whether blood work had been done in connection with his 1985 physical, and (2) whether Dr. Bird believed that Powell had hepatitis C. Dr. Bird answered that no blood work had been done in 1985 because Powell was a transfer and that, yes, he believed Powell did have hepatitis C. Dr. Bird suggested that this was Dr. Wasser's opinion as well. Dr. Bird included Dr. Wasser's report in his response to Powell and indicated that he would be sending the Wasser report to the personnel department. Dr. Bird's handwriting on the bottom corner of the letter (itself dated 12/17/93) reads "copies sent to Mr. Powell, Attorney M. Power, and Kate Alexander (City Hall)." As Alexander admitted on cross-examination, the Wasser report nowhere suggested that Powell was incapable of performing the physical requirements of a police officer or attending the police academy.

25. On December 21, 1993, Dr. Bird sent a letter to the personnel department stating that, "I feel that Mr. Powell has a condition which would disqualify him for appointment to a public safety position. Listed as a disqualifying condition is active hepatitis. As it is my feeling, and that of the consultant [Dr. Wasser], that Mr. Powell has chronic active hepatitis, I feel he would currently be disqualified." The December 21, 1993 Dr. Bird letter did not mention the need for a liver biopsy. Dr. Bird said that he was not aware of any other officers being disqualified for having hepatitis C, but recalled having tested some firefighters for the disease.

26. Dr. Bird testified that he was motivated to write the December 21, 1993 letter for two reasons. First, he was "primarily" motivated to disqualify Powell because the "Revised Medical Guidelines and Procedures for Admission to Entry-Level Police Officer Training Programs" (hereafter, the "Guidelines") listed "active hepatitis" as a potentially disqualifying condition. Second, the "low risk of infectivity" influenced Dr. Bird's decision to

write the letter. Dr. Bird felt that police officers could bleed in the line of duty, and thereby create a greater risk to the public. Dr. Bird noted that hepatitis C could be passed on through blood, sexual relations, and other bodily fluids. Dr. Bird had no other concerns about Powell's physical ability to do the job of a police officer.

27. Dr. Bird informed Powell that he should have a liver biopsy. He testified at trial that thought a biopsy might affect employability if the biopsy showed that the hepatitis C was severe enough.

28. Dr. Alan Ross ("Dr.Ross") credibly testified as to the general medical understanding of hepatitis C in 1993. The term "active hepatitis" was most closely associated with "acute hepatitis." "Acute hepatitis" was a term describing the condition of a person who became sick with hepatitis. Someone with acute hepatitis would have symptoms such as vomiting, weight loss, a jaundiced look, light stool, and dark urine. "Chronic hepatitis" described people who had had contact with the hepatitis virus, but who were not actively exhibiting symptoms. "Hepatitis C" very uncommonly produced acute hepatitis. Only about 5–10% of people with hepatitis C would exhibit symptoms initially. Hepatitis C did not make people ill without warning. The illness arose from damage to the liver, which was generally a gradual process. Chronic hepatitis C might lead to cirrhosis after ten to twenty years, and that condition would produce an acute illness, but this progression did not occur in everyone.

29. Ross described the risk of transmission as "low." A random needle stick or a "splash" [of blood] would usually not result in contamination. Transmission usually occurred from a hollow bore nee-

dle, a drug abuse situation, or sexual contact. Caretakers of hemophiliacs with hepatitis C, for example, very rarely were infected.

30. A liver biopsy did not *diagnose* hepatitis C. A RIBA test and a PCR test were the diagnostic tools for hepatitis C in the late 80's and early 90's. According to Dr. Ross, a liver biopsy would have been helpful only to determine whether some kind of *treatment* was appropriate. Indeed, for treatment purposes, a liver biopsy would have been "customary." The risks associated with a liver biopsy would have been "not enormous, but significant." The biopsy would have obtained a piece of liver tissue through a stab with a narrow needle. The procedure would have been painful, and could have involved severe bleeding, since the liver is a vascular organ. The patient would have been observed for a number of hours following the procedure.

31. The treatment for hepatitis C, if the patient chose it, was an extended course of the drug Interferon. Side effects included depression and emotional instability. Dr. Ross opined that someone in a public service job, especially if he had no symptoms of the disease, might not want to get involved with Interferon treatment due to the side effects, and the fact that, in the course of time, less drastic treatment modalities might be developed.[2]

32. Dr. Ross credibly testified that all this information was available to a medical practitioner in 1993. Concerns about hepatitis C were being discussed regularly within the medical profession.

33. Dr. Ross credibly opined that requiring a liver biopsy for purposes of assessing whether Powell was able to return

2. Dr. Bird testified that the side effects for Interferon were like chemotherapy, and that it was "not unusual" for people to decline treatment when the benefits and risks were outlined.

to work was not reasonable. As noted, a liver biopsy was proper solely for purposes of determining whether treatment might be appropriate, but the procedure would have told Powell's physicians "nothing about employability."

34. Dr. Ross also confirmed that Powell was medically capable of working as a police officer in 1993. Powell did not have acute hepatitis and neither exhibited nor experienced any symptoms of hepatitis C; every physician who saw him described Powell as asymptomatic.

35. Powell's medical review was governed by the Guidelines. The Guidelines required Dr. Bird to submit Powell's medical documentation to "the Appointing Authority/Employing Agency." In this case, the "authority or agency" was the City of Pittsfield personnel office. Dr. Bird's December 21, 1993 letter constituted the submission required by the Guidelines.

36. At the time, however, Pittsfield's personnel department was unstaffed, and Alexander was fulfilling its responsibilities with regard to Powell. Alexander received Dr. Bird's letter on Pittsfield's behalf.

37. The Guidelines required Alexander to submit Powell's medical documentation to the Prescreening Coordinator at the Massachusetts Criminal Justice Training Council. Alexander never did this.

38. Under the Guidelines, the application of a candidate who was found not to be in conformance with the Medical Guidelines by the Prescreening Coordinator was to be "deferred, pending evaluation, by the Council Medical Review Board (MRB)." The Guidelines then provided that "[t]he MRB shall be convened within a reasonable time following the Prescreening from which a candidate has been deferred, and will conduct its reviews in an expeditious manner." Under the Guidelines, "[t]he Medical Review Board may except candidates from these Medical Guidelines, in whole or in part, consistent with the princi-

ple of Bona Fide Occupational Qualification . . . ." The upshot of this language was that, when a candidate appeared to be barred from entry to the Academy due to a particular condition, such as Powell's hepatitis C, the Medical Review Board upon receipt of the medical documentation would make an independent determination of the candidate's fitness and, in an appropriate case, make an exception to permit admission. The failure of Alexander to submit the necessary documentation to the Prescreening Coordinator deprived Powell of the opportunity to obtain the exception, which in view of his robust health and lack of symptoms he would very probably have received.

39. Alexander testified that as of December 21, 1993, she was completely unfamiliar with the Guidelines. She took the position that only the Mayor could disqualify Powell, but conceded that opinion did not derive from the Guidelines. Alexander further allowed that she had not read the Guidelines carefully to determine how someone got to the Medical Review Board, or to determine what actions the City had to take to disqualify Powell. Alexander's testimony on this point is of doubtful credibility. Her failure to follow the established procedure for someone in Powell's position played perfectly into the scheme to delay or impede Powell's return to the Pittsfield police department as long as possible. Her ignorance of the procedures, if true, was extremely convenient.

40. Powell was thus kept from reaching the Medical Review Board by Alexander's failure to forward Powell's medical documentation to the Criminal Justice Training Council. Alexander's inaction left Powell in limbo. He continued in his ambiguous status, neither qualified *nor* disqualified for reinstatement, until 1996.

41. On December 21, 1993, Powell saw Dr. Veronica Deyeso ("Dr.Deyeso"). Dr.

Deyeso found no reason for Powell to have professional restrictions, and reported that the risk of infection was extremely low. Dr. Deyeso recommended that Powell get "a liver biopsy to determine if he has chronic active or chronic persistent hepatitis."

42. On February 15, 1994, Gogel wrote to Alexander stating that Powell did not have active chronic active hepatitis, and asked Alexander for "a written disqualification" if her view differed from Mr. Powell's, "so that [Powell and Gogel] may commence appellate review of this matter." Gogel enclosed a handwritten note by Dr. Mark Gilbert ("Gilbert") stating that Powell did not have chronic active hepatitis, which (according to Dr. Gilbert), could only be diagnosed by a liver biopsy. Gogel was not paid to write this letter. He was acting on Powell's behalf through all of 1994 because he had been compensated as part of the 1993 settlement, and felt that he owed Powell some continued representation in order to get Powell back to work.

43. Gogel testified that he asked for a final decision—even disqualification, if that was to be the City's position—so that Powell could take further legal action if necessary. Gogel credibly testified that if Powell had been formally disqualified, and not permitted reinstatement as the settlement agreement called for, Gogel would have referred him to another lawyer with more experience in those matters.

44. Alexander did not issue the written disqualification, although she confirmed on cross-examination her understanding of Gogel's letter as asking for either a disqualification or immediate reinstatement. On February 22, 1994, Alexander wrote to Gogel, stating that a disqualification was "premature." Alexander wrote that Gilbert's report did not "resolve the City's concerns," that the City "has been waiting over two months" for "Mr. Powell to let it know just what he wants to do," that Gilbert's report "raised more questions than it answered," and that "the City is not prepared at this time to formally disqualify Mr. Powell . . . ." Alexander wrote that she felt that "[w]orking together to resolve these complications would seem to be more effective and more in Mr. Powell's best interests than threatening appellate review." Alexander asked Gogel to let her know "whether Mr. Powell intends to proceed with the next medically indicated step," and offered to pay for it. Mayor Reilly was copied on her letter. Reilly had no memory on the stand of even being consulted about the decision to disqualify or reinstate Powell.[3]

45. Powell indicated that he was reluctant to get a liver biopsy because he felt it was a serious procedure, and he did not think he needed it in order to confirm his qualifications for reinstatement.

46. Powell was erroneously arrested on February 23, 1994 in New York. As part of his taxi business, Powell picked passengers up at the bus terminal at 165th Street in New York. He credibly testified that he had never seen them before. Powell was stopped on the Taconic Parkway because his taillight was out. The officer found a significant quantity of cocaine in the car. Powell was arrested, but when he went to court, the charges were immediately dismissed on April 4, 1994. Powell did not approach Chief Lee and explain the arrest or dismissal. Chief Lee, however, did learn of the arrest. This is when Chief Lee first learned of Powell's limo business.

47. In late March, Powell saw Dr. F. Borhan–Manesh ("Dr. Borhan–Manesh") at the Veterans Administration Medical Cen-

---

3. Reilly also testified generally that he received between ten and twenty cc's per day, and it was not unusual for him to have them filed unread.

ter in Albany, New York, and received a liver biopsy. Powell went to Dr. Borhan–Manesh because he wanted the test done in a facility where the Pittsfield officials would have no influence. He underwent the procedure despite his misgivings, because he hoped it would facilitate his return to the Pittsfield police department. The biopsy, performed as an outpatient procedure, was painful.

48. On March 30, 1994, Alexander sent a letter to Gogel. Alexander mentioned that she had read an article in the Berkshire Eagle about Powell, and asked about the tests that Powell would be having. Alexander stated that the City would not "be responsible for payment for any procedures or medical treatment obtained by Mr. Powell unless these are performed by physicians approved by and agreed to in advance by the City. Dr. Gordon Bird must be the referring physician and his office will set up all referrals."

49. Sometime during the winter or spring of 1994, Powell began receiving public assistance. He also borrowed money from his mother-in-law to make ends meet. The effect of being out of work and the humiliation of going on public assistance and having to borrow money in this way was, according to Powell, "devastating." Both Powell and his wife were having migraine headaches.

50. Around March of 1994, Powell began a twelve-week entrepreneur course. Reilly spoke at Powell's graduation in June, and the two greeted each other briefly.

51. Lee testified that sometime in the Spring of 1994, Powell came to Lee's office about two issues. First, Powell complained that a competitor in the taxi business was stealing fares. Second, Powell allegedly told Lee that the taxi business was going well and that he intended to seek a disability retirement. Chief Lee testified that he thought that Powell had made a decision not to return to the police department and telephoned Alexander and Reilly, informing them that Powell was seeking disability retirement. Powell testified that he never had this conversation, never informed Lee that he was going on disability retirement, did not believe he was disabled, and always stated that he intended to return to work as a police officer as soon as possible. Powell's testimony, in view of the evidence as a whole, is more credible than Lee's.

52. On May 3, 1994, Dr. Borhan–Manesh issued his report to Attorney Nardi, who was working with Attorney Gogel, after examining the results of the liver biopsy. Dr. Borhan–Manesh confirmed that Powell had "chronic hepatitis C with mild to modest activity." Dr. Borhan–Manesh reported that Powell was "looking healthy and fit for his job as a police officer. There are millions of people in the USA infected with hepatitis C virus with no or mild to moderate liver disease. I know many nurses and laboratory technicians with chronic hepatitis C who are working with full capacity." Dr. Borhan–Manesh submitted that the risk of transmission was low. Dr. Borhan–Manesh also noted that Powell might be able to eradicate the virus from his body with a course of the drug Interferon.

53. On May 4, 1994, Alexander spoke to Bill Appel ("Appel"), who was employed in the Human Resources Division of the Commonwealth of Massachusetts. Appel was apparently an expert in civil service law. Appel told Alexander that having an employee with hepatitis was not prohibited by the civil service law. Appel also told Alexander that she could have "a major [Americans with Disabilities Act] problem." Alexander's note from that conversation indicates that she and Appel also discussed the issues of whether an employer could "reasonably accommodate" Powell

and whether Powell was "unable to do the job." The phrase "punitive damages" also came up.

54. On May 6, 1994, Gogel wrote to Alexander "demand[ing] immediate reinstatement to the Pittsfield Police Department in accordance with the Settlement Agreement" based upon Dr. Borhan–Manesh's report, which he attached.

55. On May 9, 1994, Dr. Bird received the Dr. Borhan–Manesh report.

56. On May 9, 1994, Alexander spoke with Chief Lee about whether Powell might be entitled to ordinary disability retirement, or "ODR." Alexander testified that at this meeting Chief Lee mentioned his concern about whether hepatitis C was a communicable disease.

57. On May 10, 1994, Alexander had a conversation with an unidentified person on potential "ADA problems" which caused her to write on a note taken during the conversation, "Is [Powell] a qualified handicapped individual? If so, can we 'reasonably accommodate' him?"

58. On May 11, 1994, Alexander, Reilly, and Lee met to discuss Powell's situation. Alexander's note from that meeting refers to "conclusive med. evid. w/ results of biopsy," indicating that Alexander had received Dr. Borhan–Manesh's report by this time. Her meeting note also referred to "enforcing [the] ADA." Also, for the first time, Alexander's notes referred to what would eventually become a new theme in the City's relationship with Powell, the "2 job rule." The meeting notes also showed that Lee had called "PERA," or the Public Employee's Retirement Association. The bottom of the note stated, "write Gogel asking for full release of all records." The court finds that as of the date of this meeting, some eight months after the signing of the settlement agreement, defendants were still resisting plaintiff's reinstatement despite the Dr. Borhan–Manesh letter, were still attempting to steer the plaintiff towards some kind of disability retirement despite the absence of evidence of any legitimate disability, and were preparing a new line of defense to Powell's reemployment: the "2 job rule."

59. On May 12, 1994, Alexander wrote back to Gogel. Alexander reminded Gogel that reinstatement was conditioned upon Powell's successfully completing a physical examination, "as well as whatever other conditions Chief Lee determined to be necessary in the best interest of both Mr. Powell and the Department." Alexander stated that "[a]ccording to the standards utilized by the City's physician, Mr. Powell has not yet succeeded in passing the physical examination, nor has he complied with the agreement." The May 12, 1994 letter continued by criticizing the lack of data in the Dr. Borhan–Manesh report, claiming that "[t]he letter from Dr. Borhan–Manesh makes certain pronouncements, but fails to include a formal report or to support his conclusions with any data susceptible of an analysis by the City's physicians." The May 12 letter concluded by asking that Powell execute a release of records and authorization so that Dr. Bird could examine Dr. Borhan–Manesh's data. Significantly, Alexander also wrote, "if the City physician is satisfied that Mr. Powell may safely return to work and perform his duties based upon those results, Mayor Reilly will then, assuming all other conditions are met, make a determination, with Chief Lee, in regard to reinstatement." As will be seen, Alexander's blatant failure to keep this promise will be one of the pivotal points of evidence in this litigation. Alexander's letter made no reference to the "2 job rule."

60. On May 13, 1994, Alexander was provided with the requested release form from Powell, proof again that plaintiff was still complying with the defendants' requests for documentation in pursuit of re-

instatement. Alexander forwarded the release to Dr. Bird. On May 23, 1994, Dr. Bird sent a letter to Dr. Borhan–Manesh requesting the records.

61. On June 10, 1994 Powell received a loan from the City Savings Bank for $45,000. Powell purchased four vehicles with the money sometime thereafter to start his business. Powell produced a flyer in connection with this venture. Powell (rightly) believed at this time that the City might very well continue to block his efforts to be reinstated.

62. Dr. Bird was concerned about the issue of Powell's re-employment as a police officer suffering from hepatitis C, especially after he received the Dr. Borhan–Manesh report, and he conscientiously pursued the subject. Throughout June of 1994, Dr. Bird spoke with officials at the Center for Disease Control, and the University of Massachusetts Medical Center about hepatitis C. On June 23, 1994, Dr. Bird was told in a telephone conversation with these officials that there was no reason that Powell's condition should limit his physical activity or duties as a policeman. These officials put their opinion in writing, sending Dr. Bird a letter [4] which stated that "there is currently no reason to restrict the duty of policemen with chronic active hepatitis C on this basis alone. Also, the Massachusetts Department of Public Health informed us that there are no state guidelines that impose restrictions for such a case."

63. On June 24, 1994, Reilly visited Dr. Bird for a personal medical appointment. During this visit, they discussed Powell generally.

64. On June 27, 1994, Dr. Bird called Alexander, mentioning that he had spoken to Reilly. He told Alexander that he had sought advice on Mr. Powell's condition, and that the Center for Disease Control and the Department of Public Health said there "should be no problem" with Powell working.

65. On June 28, 1994, Attorney Nardi sent a letter to Alexander, claiming that Pittsfield had breached the Settlement Agreement through its "silence." He demanded Powell's reinstatement.

66. On June 30, 1994, Alexander wrote to Gogel in response to Nardi's letter (she preferred not to deal with Nardi). The letter was a full three pages. It outlined Alexander's version and interpretation of the events leading up to June 30th, and disagreed that the City was in breach of the Settlement Agreement. Alexander expressed her displeasure with "these bombastic threats of litigation for the City's delay in this matter." Two additional points in the June 30th letter are of note. First, Alexander wrote that "[w]hen the City learns the conclusions and recommendations of its physicians, Mr. Powell will be notified—through correspondence to you— as promptly as the City has responded throughout this entire period." Alexander wrote this sentence despite having been told by Dr. Bird three days earlier that there should be "no problem" with Powell working. Second, Alexander wrote,

there is a matter apparently of interest to Mr. Powell which perhaps should be discussed prior to the City's determination. However, due to your co-counsel's tactic of providing the most confidential material, including attorney correspondence, to the press in an apparent effort to persistently exploit this matter, the

4. This letter was mis-dated and mis-marked; the date on it reflects that it was written June 28, 1994. Dr. Bird wrote on it, "rec 7/25/94 KB," presumably meaning *June* 25, 1994. In any case, Dr. Bird must have received the letter on June 25, 1994, or at least prior to June 27, 1994. He discussed its contents with Alexander in their June 27, 1994 phone conversation, discussed below.

City will not discuss it with anyone other than you, nor will we discuss it if the contents of this letter are not treated confidentially. Therefore, if you wish to contact this office, we will be happy to discuss this matter at that time.

Alexander later testified that this "other matter" referred to the possibility of Powell applying for a disability retirement. Gogel said on cross-examination that he never responded to Alexander's oblique offer.

67. Alexander testified that Chief Lee told her that, sometime in the spring, Powell saw Chief Lee and said that he (Powell) was "not excited" about going back to work, and wanted to pursue a disability retirement. As noted, Powell credibly denied ever telling Chief Lee that. Powell allowed that he did tell Chief Lee, when he saw him outside City Hall sometime after June 1994, that the *City* had offered him disability retirement. Gogel credibly denied that Powell ever sought to avoid going back to work so that he could pursue his business and a disability retirement. Powell credibly denied that he *ever* wanted to pursue his business and a disability retirement instead of going back to work. As noted, Chief Lee admitted on cross-examination that if Powell had retired, it would have "solved a lot of problems."

68. On July 5, 1994, Dr. Bird wrote a letter to Alexander that constitutes, perhaps, the most significant piece of evidence in this case. He confirmed that he had "stated in a letter 12/21/93 that [he] felt [Powell] would be disqualified due to the presence of chronic active hepatitis." Dr. Bird then reviewed the information he had received since issuing that opinion. He wrote, "[n]ow that the exact nature and stage of Mr. Powell's chronic liver disease is known, I feel that he does not have a condition which would disqualify him from returning to the police force." Dr. Bird testified that after writing this letter to Alexander his responsibilities with regard to Mr. Powell's reinstatement were over. As he put it, he was "done."

69. Dr. Bird credibly testified that, although normally he would have sent this letter to the Pittsfield personnel department, he sent it to Alexander directly at her request. Dr. Bird did not even copy the letter to the personnel department, at Alexander's explicit request.

70. Upon receipt of the letter, Alexander immediately contacted Dr. Bird and instructed him to keep the document secret. To insure compliance with her instruction, Dr. Bird put a note on the letter in his file that said, "Confidential per request [of] K. Alexander." Alexander denied, without credibility, ever asking Dr. Bird to keep the letter confidential, but conceded that she never told anyone else about the letter. She testified further that she did not view the letter "as significant" for the reason because in her mind, it "wasn't a report." None of this testimony was credible. In fact, the letter was obviously repressed as part of the effort to forestall Powell's reinstatement and to avoid performing on Alexander's promise to permit reinstatement "if the City physician is satisfied."

71. Alexander testified that the only reason Powell was not reinstated as of July 5th was because he was seeking disability retirement. She acknowledged on cross-examination that this was her view despite the fact that she had received a "nasty" letter from Nardi only two weeks earlier demanding Powell's reinstatement. Alexander declared by way of clarification that Dr. Bird's July 5, 1994 letter, "was a change in Dr. Bird's position but not the City's."

72. Reilly credibly testified that he never saw the July 5th letter until the present litigation, and Alexander said that she never sent it to him (or anyone else).

Reilly said that if he had been aware of the letter, the process "could have" been expedited. Reilly never told Alexander to keep the July 5th letter under wraps.

73. Neither Powell nor Gogel knew of the existence of the July 5th letter until this litigation.

74. Gogel credibly testified that, even after July 5, 1994, Alexander continued to rely on Dr. Bird's December 21, 1993 disqualifying report the entire time he dealt with her. Gogel testified further that if he had known about the July 5th letter, he would have gotten Powell reinstated immediately or sued under the Settlement Agreement. All the statements Alexander made to Gogel after July 5th falsely suggested or implied that Dr. Bird continued to opine that Powell was disabled, and that it was Powell's health problem which was keeping him from being reinstated.

75. On July 13, 1994, Powell received three additional limo licenses.

76. Gogel testified that, at some point, Alexander—not Powell and not he—suggested the idea of disability retirement. When asked on cross-examination if disability retirement was Powell's idea, Gogel credibly responded, "absolutely not." Alexander told Gogel that if Powell applied for disability retirement, the City "wouldn't fight it."

77. On July 25, 1994, Alexander wrote to Gogel in reference to an apparent July 13th phone conversation, asking for an update "on the subject of our discussion, and his reinstatement generally." Alexander said without credibility that in this July 13th phone conversation, Gogel told Alexander to "hold off" on seeking a report from Dr. Bird. Gogel vehemently and credibly denied ever asking Alexander to do this. Dr. Bird credibly denied that he was ever asked to hold off on his report—in fact, he had sent his report to Alexander on July 5th, over a week before Alexander

testified that Gogel asked her to have Dr. Bird "hold off."

78. In her affidavit to this court in connection with Powell's 1996 *pro se* motion to vacate the Settlement Agreement, Alexander said that she advised Gogel on July 13th that if Powell intended to apply for disability retirement, "he should do so before the City Physician made a decision on his qualification for duty ...." Yet Alexander admitted on cross-examination that she did not inform Gogel of the July 5th letter in this telephone conversation. Alexander's failure to disclose, to this court in her affidavit or to Attorney Gogel in her conversations with him that, as of July 5, 1994, she had in her possession unambiguous documentation of the City Physician's opinion that Powell *was* fit to return to work constitutes egregious misconduct and reflects the defendants' level of determination to retaliate against Powell for his earlier lawsuit by blocking his reinstatement by whatever means.

79. Sometime in late July, Powell—having finally decided that he would probably have to settle for retirement or nothing—visited Dr. Bird and asked him to complete his disability retirement paperwork. Powell went to Dr. Bird because, as far as he knew, Dr. Bird was the only physician who, in fact, had concluded that he *was* disabled. None of his other doctors thought that Powell suffered from any sort of disabling condition. Since (as far as he knew) Dr. Bird was the one saying he could not return to work, Powell assumed Dr. Bird should sign the form confirming his disability. Powell credibly testified that he only applied for disability retirement because he believed that the City would not rehire him. Dr. Bird was "surprised" to see Powell with the form, in part because Dr. Bird, by this time, did not view Powell as disabled. Dr. Bird refused to sign the form; he told Powell,

incorrectly, that his refusal was because he was not Powell's treating physician. In fact, he refused to sign the form attesting to Powell's disability because he did not think Powell was disabled. Dr. Bird credibly testified that he did not inform Powell of the change in his opinion because of *Alexander's* request to keep the letter confidential. He testified further that Alexander's request was the only reason he did not tell Powell of his employability; without the Alexander directive, Dr. Bird said he "probably" would have put Powell on notice of his July 5th letter and his conclusion that Powell was fit to return to work.

80. Dr. Bird also credibly testified that, at some point, Alexander told him not to talk to Powell, and directed him not to fill out Powell's forms. Alexander instructed Dr. Bird to talk to her instead, and she would talk to Powell's attorneys. Dr. Bird felt that he was in an awkward position keeping information from his patient, but explained that at the time he felt that the information was the City's, so he should comply with the City's request. Powell was thus placed in the Kafkaesque position of being told to apply for a disability retirement, when the only physician who could confirm his disability had secretly opined that he was quite fit to work, but despite their physician/patient relationship had decided not to tell him the truth.

81. On July 26, 1994, Dr. Bird called Alexander, and understandably asked her "what's going on?" Dr. Bird told her that Powell had been to see him with the disability form.

82. Alexander's affidavit says that on July 27, 1994, Gogel telephoned her and said that "reinstatement issues should be put 'on hold' for the time being" because Powell intended to apply for disability retirement. Gogel credibly denied ever saying this. The evidence is clear that, at any time before or after July 5, 1994 Powell

would have been eager and willing to return to work as a Pittsfield police officer.

83. On July 28th, 1994, Dr. Bird wrote to Powell returning Powell's uncompleted disability form because, at least as Dr. Bird said in that letter, "[t]his form is usually completed by the individual's personal and treating physician."

84. During the summer of 1994, Powell felt that his taxi business was doing no more than "paying the bills."

85. On August 9, 1994, Powell filled out an Intent to Retire Form. He did this based on his conviction that the City would never permit his reinstatement as a police officer.

86. On September 6, 1994, Alexander wrote to Gogel and asked about the progress of his disability retirement, noting that Dr. Bird had returned the disability form because Powell needed to have it filled out by his own doctor. Reilly said that he heard in the summer of 1994 that Powell was seeking a disability retirement.

87. On September 8, 1994, Gogel wrote back to Alexander and said that Powell was having trouble with his application because he did not have ten years of service with the Police Department. Gogel reported that Powell was told that he would not be given credit for the years for which he had received back pay pursuant to the Settlement Agreement. Without this credit, Powell could not meet the minimum ten-year requirement.

88. On September 20, 1994, Alexander wrote to Gogel and said that because Powell was paid a lump sum settlement instead of regular compensation, Massachusetts law would not permit crediting the time of service included in the settlement for disability retirement purposes. Alexander said that "we are not sure how we can assist Mr. Powell in resolving this problem," and that she "just wanted to respond

to [Gogel's] letter as promptly as possible." Alexander said that she had advised the Mayor of the situation and would soon be discussing it with him. At some point, Powell asked Gogel to inquire if Powell could "buy back" his lost time.

89. In the September 20th letter, Alexander also made what can only be characterized as the outrageously misleading statement that at the time of settlement, "no one anticipated that [Powell] would have a health problem which would impede the reinstatement." This statement was made at a time when she was perfectly aware of the unanimous medical opinion, including the considered view of the City's own physician, that *no* health problem impeded Powell's reinstatement. Alexander testified without credibility on cross-examination that it never crossed her mind that Powell would not have applied for a disability retirement if he had known about Dr. Bird's July 5th change in opinion. She also asserted that she did not believe her September 20, 1994 statement was misleading.

90. Alexander wrote to Gogel again on October 17, 1994, asking for an update. Gogel did not respond.

91. On November 11, 1994, Powell visited Dr. Bird again. Powell asked Dr. Bird a second time to complete his form. Dr. Bird once again did not tell Powell about his change in opinion, and once again refused to sign the form.

92. On November 17, 1994, Dr. Bird wrote to Powell to follow up on their November 11 meeting. In his letter, Dr. Bird ironically said, "[a]fter discussion of your request with the City Solicitor, I have been advised that it would be ethically inappropriate as the City physician for me to give you directly any statement of disability or complete the application. It was suggested that you continue to pursue this through the normal medical and legal channels." Dr. Bird copied this note to Alexander.

93. In a conversation with Alexander on November 14, 1994, Reilly told Alexander to talk to Gogel about "finding a doctor who will say what [Powell] wants." Alexander's telephone notes reflect this comment, as well as her own editorial: "great solution!" When asked about this comment, Reilly said that he meant that Powell had to get his own doctor "because we weren't going to retire him involuntarily." Ironically, the City insisted that Powell's retirement flow from his own voluntary and properly supported application when Alexander (at least) knew that Powell suffered no disabling condition, and when Powell himself wanted to work, not retire. Reilly's testimony was credible to the extent that he sincerely hoped to assist Powell in obtaining a voluntary disability retirement, provided the assistance did not require the City to do anything improper. His statement was also consistent with his motivation to keep Powell out of the police department, if at all possible, in order to avoid friction that might arise from the officers who bore Powell ill will because of the prior lawsuit. His conversation with Alexander also confirmed Alexander's continued pursuit of this "great solution."

94. On November 22, 1994, Alexander wrote to Gogel. She noted that Powell had approached Dr. Bird again to sign his form, which she thought "inappropriate." Alexander then wrote:

> If Mr. Powell does not intend to proceed with his disability retirement application, then we should discuss the possibility of his returning to the Police Department if medically permitted. For that, I would need to contact Dr. Bird since, as you recall from our telephone conversation in July, we had requested that he hold off on his report to the City until

after the possibility of a disability retirement was fully explored by Mr. Powell. As noted, Gogel credibly and emphatically denied any agreement to have Dr. Bird hold off on his report, and Dr. Bird credibly denied ever being asked to "hold off" on his report. In Dr. Bird's words, any statement to the contrary was "inaccurate." The phrase "if medically permitted" in Alexander's letter was obviously misleading, since it implied that this issue of Powell's qualification for reinstatement remained unsettled, which it was not. Gogel testified that he just "ignored" the November 22, 1994, letter.

95. On December 21, 1994, Powell took out a loan for $68,500 from the Urban Initiative Fund and used it to purchase four additional vehicles for his business. That gave Powell a total of eight vehicles, which were operated by his children and some subcontractors.

96. On December 27, 1994, Alexander wrote to Gogel seeking an update, and queried whether Gogel was still Powell's counsel. On December 28, 1994, Gogel wrote to Alexander and informed her that he had suggested to Powell that he get new counsel. Gogel was moving his practice. Significantly, during the entire period in which Gogel was representing Powell, Alexander never raised the "2 job rule" as a bar to reinstatement.

97. On December 28, 1994, Chief Lee reported to Alexander that an officer had overheard, on a police radio, Powell talking on a cell phone, saying that he was going to sue the City for failure to reinstate him. On January 4, 1995, Alexander wrote to Powell on the status of his decision to pursue disability retirement. She requested the name of Powell's new attorney so she could continue to obtain status updates. On January 26, 1995, Powell obtained two new taxi licenses.

98. On March 23, 1995, Attorney Elton Williams wrote to Alexander and informed her that he would be representing Powell. Williams was a friend, and Powell had no money to pay him. As Powell testified, Williams agreed, in essence, to write some letters on Powell's behalf.

99. On March 28, 1995, Alexander wrote back to Williams. She advised him that she would be happy to meet with him and discuss Powell's case. On April 25, 1995, Alexander sent Williams numerous copies of correspondence involving Powell. As before, Alexander did not mention the July 5th letter or include a copy of it in the documents she mailed to Attorney Williams.

100. On May 12, 1995, Alexander and Williams met. For the first time, Alexander brought up the "2 job rule," the pertinent City ordinance, and Powell's taxi and limousine business, as possible impediments to Powell's return to work. As noted above, Alexander, Reilly, and Lee had had the "2 job rule" in mind as a possible fall-back pretext to delay Powell's reinstatement for about a year, since their discussion on May 11, 1994. On May 30, 1995, Williams wrote to Alexander stating that Powell was "ready, willing and able" to return to work. Williams asked for the date Powell should report to work, and what other conditions Alexander felt should be fulfilled. Alexander testified that she forwarded this letter to Chief Lee.

101. Alexander wrote to Williams on June 5, 1995, and informed him that "a re-examination of Mr. Powell's medical condition will certainly be requested," and again raised the issue of Powell's limo and taxi business. Alexander wrote again on July 11, 1995, for a status update.

102. Powell believed that his taxi business should not delay his return to the police department. Reilly and Chief Lee both knew about the business, had spoken to him about other matters, and had never

raised the business as a potential issue. Reilly was at Powell's entrepreneur school graduation, and Chief Lee had a conversation with Powell outside City Hall. Powell intended to have his wife and children run the business when, and if, he got his job back. Powell also knew of other officers that were permitted to have a second job. Several were teachers and coaches. One owned a bar in Dalton. Another was a hypnotist, and Pittsfield officers got "comp time" for going to see him. Another owned a bathtub business.

103. Reilly explained that the Department had made a decision to encourage officers to coach as part of a community outreach program. Reilly knew of another officer who had an interest in a bar in the jurisdiction, but was constantly monitoring the situation to make sure that the officer was not working there. Reilly said that the officer who was operating another bar was told to stop. Reilly believed that enforcement of the "2 job rule" was Chief Lee's concern, but supported his decision regarding Powell. Reilly believed that Powell could be an investor in the taxi business, but could not hold the license for the business. Lee believed that the taxi business was different from other second jobs because the police department was an agent of the Licensing Board which had granted Powell's licenses.

104. On August 8, 1995, Powell filed a Statement of Discontinuance, confirming that he had withdrawn from the business of Powell Limo. On August 14, 1995, the business was transferred to Dawn Powell, Powell's spouse. On August 21, 1995, Williams sent Alexander a letter with copies of the discontinuance and change of directors form, and said, Powell "is no longer the owner, operator of the taxi cab business," and asked Alexander what else they needed to do.

105. On August 28, 1995, Alexander wrote to Williams and confirmed receipt of his letter and enclosures. She described Powell's actions as "certain initial steps toward divestment of his interests in his taxi and limousine businesses." Alexander then questioned the authenticity of the documents, saying that she couldn't tell by looking at the documents "in a vacuum," and said that "it is not incumbent upon this office" to get the information she claimed to need, opining that "it is Mr. Powell's burden ...." Alexander continued by saying that "even if all else is in order," Powell could not remain the licensee for his vehicles, or hold an interest in the enterprises. Alexander then asked about Powell's medical condition. She concluded by saying that "[o]nce the status of these two issues—the businesses and his health—had been determined, Chief Lee will be able to provide information on when Mr. Powell should report and what other requirements he must fulfill upon or before returning to duty."

106. On September 7, 1995, Williams wrote to Alexander stating that he would meet with Powell "to address your requests and demands" set forth in the August 28, 1995 letter. Alexander wrote Williams on October 26, 1995, November 22, 1995, and again on January 5, 1996, asking for status updates. Williams wrote to Alexander on January 10, 1996, advising her that he no longer represented Powell.

107. On January 30, 1996 Powell wrote a letter to Mayor Reilly, informing him of his intent to sue. On February 26, 1996, Powell wrote again to Mayor Reilly directly, expressing his lack of confidence in Alexander, and asking to sit down with Reilly "man to man" to discuss the situation. On March 1, 1996, Reilly wrote back to Powell. That letter attempted to justify Alexander's actions and stated the City's position. Reilly then offered to meet with Powell, along with Alexander and Chief Lee. Reilly's testimony regarding his re-

sponse to the request for a meeting confirmed his general position that he bore no ill feelings against Powell personally. His sympathetic response to Powell was accompanied, however, by a realization that, due to the prior lawsuit, Powell's return to the police department would not be welcomed by some of the officers. Reinstatement posed a risk of disruption that a disability retirement would have avoided.

108. On March 5, 1996, Powell wrote back to Reilly. The letter was quite lengthy. Powell wrote that Dr. Bird was "the only physician claiming [Powell had] a disqualifying condition" and noted that he had no jaundice or other symptoms. He cited the Dr. Wasser and Dr. Borhan–Manesh reported describing him as asymptomatic, healthy, and "strapping." Powell then discussed his low risk of infectivity, citing other doctor's reports. Powell then disputed some of the assertions in the Mayor's letter. Powell said, "I don't like conflict and I don't enjoy fighting with anyone but I absolutely refuse to allow myself to be treated unfairly." Powell also mentioned that "Dr. Bird had the audacity to state to me that I had to speak with Solicitor Alexander before I could get anything out of my file. Of course I had a few things to tell [Dr. Bird's assistant] and I requested that she put that into writing that she was refusing to give a letter out of my medical file unless I spoke with your Solicitor. . . . I believe your Solicitor has gotten too personally involved and somehow made this a personal war."

109. On March 15, 1996, Powell filed a *pro se* motion before Judge Frank H. Freedman, who had presided over the original lawsuit, seeking to vacate the Settlement Agreement. Alexander responded with an Opposition and forty-nine exhibits. Alexander included her own forty-seven paragraph affidavit, which did not mention the July 5th Dr. Bird letter. Alexander also attached an affidavit from Dr. Bird, which she drafted; it also made no mention of the July 5th letter. Although Alexander asked Dr. Bird to correct any errors in the affidavit, he did not correct the affidavit so that it would mention the July 5th letter. Alexander testified that "it never occurred to me" to include the July 5th Dr. Bird letter in the 1996 Opposition Papers. Her statement was not credible. Any fair presentation of the documents pertinent to the dispute about reinstatement and the Settlement Agreement generally must necessarily have included the July 5th letter, which would have confirmed the absence for nearly two years of any impediment to Powell's reinstatement. Alexander's deliberate suppression of the letter distorted the record submitted to the court in an effort to avoid disclosure of the defendants' bad faith.

110. The evidence showed that, after Powell filed his *pro se* motion, Reilly put a stop to the efforts to keep Powell from being reinstated. Sometime prior to April 1996, it became clear to Chief Lee that Mayor Reilly wanted Powell reinstated. Chief Lee reminded Reilly, again, that some officers might resent Powell's return, but Reilly told Lee that Powell was coming back anyway.

111. In late March or early April of 1996, Powell had a meeting with Reilly, Alexander, and Chief Lee. They agreed that Powell would get back to work "post haste." The "2 job" problem immediately evaporated; Reilly said that a letter from Powell confirming his disassociation from any direct involvement with the business would end the matter. Powell only needed to get a physical.

112. Powell got the physical, and Dr. William DeMarco ("Dr.DeMarco") wrote to Chief Lee on April 3, 1996 to report that Powell still had a "low-grade elevation in his liver function studies, indicative of on-going chronic disease in the liver." But

Dr. DeMarco affirmed that Powell was "quite well" and "physically capable of returning to work." While Dr. DeMarco had a question about whether Powell would receive Interferon therapy, he said that "at this time this would not seem to be an obstacle to his returning to work."

113. Alexander testified on re-cross-examination that Dr. DeMarco's comment about Interferon treatment clarified a point she had been waiting for information about all along, suggesting for the first time that concerns about Powell's *treatment* had delayed his return to work. This testimony was not credible.

114. In a letter to Reilly dated April 16, 1996, Powell confirmed that he had completely divested himself of his taxi and limousine business.

115. On May 2, 1996, Chief Lee wrote to Powell and requested current medical documentation. However, on May 3, 1996, Reilly wrote to Powell and informed him of his intention to reinstate him, to grant him maximum seniority, and to pursue a special legislative act to regain all Powell's lost service for retirement purposes. Reilly did inform Powell that he would not be given back pay.

116. A special act was never pursued by Reilly. Rather, on May 20, 1996, Pittsfield allowed Powell to resume employment as a police officer, but only upon his successful completion of the academy. Powell claims that another officer, James Stimson, was allowed to return without attending the academy after being absent for seven years.

117. When asked why Powell was allowed to enter the academy in 1996, when his entry had supposedly been barred previously due to his hepatitis C, Reilly suggested that the academy standards may have become more flexible by that time. Yet Reilly admitted that he knew of no academy admission rules that had changed between 1993 and 1996. Chief Lee testified that he was not clear on how Powell "passed the physical" to go back to the academy. In any event, once opposition by the defendants disappeared, Powell had no trouble whatever entering the police academy.

118. Before attending the academy, Powell started working as a dispatcher. Prior to this time, Powell had never been offered restricted or light duty. This solution to the reinstatement problem had obviously existed for years prior to Powell's return to work but had never been considered or offered by the defendants—further evidence that Powell's difficulty in resuming employment with the police department arose from the defendants' resistance, not from Powell's disability. In September of 1996, at the age of 43, Powell successfully completed both the physical and course requirements of the police academy without accommodation and with no problems whatsoever. Powell was then fully reinstated as a police officer.

119. On October 29, 1996, a judgment was entered against Powell for $32,869.16 in favor of the City Savings Bank of Pittsfield. On December 5, 1997, a judgment for $84,822.00 was entered against Powell in favor of the Community Development Finance corporation. Powell had begun defaulting on these loans in June of 1995 due to the financial difficulties he was facing as he awaited reinstatement. His vehicles were seized by the banks following the judgments.

120. Powell estimated his lost wages as approximately $160,000. He arrived at this figure by calculating his salary for 1994 and 1995 as $60,000; his lost earnings for 1993 as $15,000; and his lost earnings for 1996 as $25,000.

121. The last W–2 form Powell had from his employment as a police officer prior to the 1991 litigation was from 1989—he made $56,694 that year. In

1997, after reinstatement, Powell earned $57,195, but this was lower than normal because Powell was working the day shift. The 4–12 shift paid 10% more. In 1998, Powell earned $67,000. In 1999, Powell earned $73,405. In 2000, $69,749; and in 2001, $75,982. These totals include both base pay and overtime but not benefits or diminished retirement entitlement. Powell was unsure what percentage of his income went into retirement.

122. Powell's business suffered an overall loss in 1994 and 1995.

123. While out of work, Powell earned $3,839.07 working part-time at the Kolburne School in 1995, and $7,721.70 in 1996.

### III. CONCLUSIONS OF LAW

The discussion below will begin with an analysis of the plaintiff's claim—first under 42 U.S.C. § 1983 and then under 42 U.S.C. § 1985(2)—that defendants retaliated against him because of his 1991 lawsuit. Next, the memorandum will turn to the claim under the Rehabilitation Act, and then to the claim of breach of contract.

### A. RETALIATION

#### 1. Amenability to Suit

To be subject to liability under 42 U.S.C. § 1983 and 42 U.S.C. § 1985(2), defendants must have been "acting under the color of state law." That requirement is easily satisfied here and does not require extensive discussion or analysis. As individuals, Reilly and Alexander agreed that they were "acting in [their] official capacit[ies] ... exercising [their] responsibilities pursuant to state law" in their dealings with Powell. West v. Atkins, 487 U.S. 42, 50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Plainly, Alexander and Reilly were acting under the color of state law throughout the period relevant to this action.

■ A municipality like Pittsfield is a "person" under § 1983 and may be sued directly for monetary relief. Monell v. Department of Social Servs. of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). All parties agreed at trial that Pittsfield's liability was contingent upon the court's findings with respect to Reilly. As Pittsfield admitted in its closing argument, Reilly had "final authority to establish municipal policy with respect to the action ordered." Pembaur v. Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Thus, Pittsfield's liability will follow Reilly's.

#### 2. § 1983

■ Powell's claim under 42 U.S.C. § 1983 for retaliation in violation of his First Amendment right to seek redress in the courts is governed by the two-part burden-shifting analysis established by the Supreme Court in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). To prevail, Powell must show first by a preponderance of the evidence that he "engaged in constitutionally protected conduct, and that this conduct was a substantial or motivating factor for the adverse employment decision." Padilla–Garcia v. Guillermo Rodriguez, 212 F.3d 69, 74 (1st Cir.2000). If Powell is able to prove this, then defendants may avoid liability only by proving by a preponderance of the evidence that they would have taken the same action "even in the absence of the protected conduct." Mt. Healthy, 429 U.S. at 287, 97 S.Ct. 568.

There is no question that Powell engaged in constitutionally protected conduct by filing the 1991 lawsuit against Pittsfield, its officials, and police officers. Defendants have not alleged that Powell's 1991 litigation was "baseless" and therefore not within the shelter of the First Amendment,

see *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), or otherwise unprotected. *Connick v. Myers*, 461 U.S. 138, 148 n. 8, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)("right to protest racial discrimination [is] a matter inherently of public concern"). Given the substantial settlement obtained by the plaintiff in 1993, any argument that the 1991 lawsuit was baseless would be frivolous. Therefore, the initial inquiry will focus on whether that litigation was "a substantial or motivating factor" underlying the defendants' actions in obstructing Powell's reinstatement.

### a. *Substantial or Motivating Factor*

The First Circuit has made it clear that Powell's lawsuit need only constitute *a* substantial or motivating factor for his delayed reinstatement, not the *only* substantial or motivating factor. *Padilla–Garcia*, 212 F.3d at 73; *Nethersole v. Bulger*, 287 F.3d 15, 19 (1st Cir.2002)(stressing that plaintiff need only show that employer retaliated "at least in part" in response to First Amendment activity). As seen below, a finding of retaliation is therefore not inconsistent with finding that defendants also delayed Powell's reinstatement because of their (as it emerged, misguided) concerns about his hepatitis C.

The Second Circuit has suggested that when reviewing a retaliation claim, the factfinder should first "determine whether the impermissible reason was at least part of the defendant's basis of its action, and if so, then answer the hypothetical question, 'Would the defendant have taken the same adverse action even if the impermissible reason had not existed?'" *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Dev. Agency*, 77 F.3d 26, 32 (2d.Cir.1996). "[A] retaliatory state of mind typically is not susceptible to proof by direct evidence ...." *Ferranti v. Moran*, 618 F.2d 888, 892 (1st Cir.1980).

A federal court evaluating a "retaliatory state of mind" question may borrow from Title VII jurisprudence because "the causation analysis for a § 1983 retaliation claim tracks the causation analysis for a Title VII retaliation claim." *Johnson v. University of Wisconsin–Eau Claire*, 70 F.3d 469, 482 (7th Cir.1995). The Supreme Court's recent decisions in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), are particularly helpful in illuminating the proper approach to the causation issue.

In *Reeves* and *St. Mary's Honor Center*, the Supreme Court made it clear that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097. Put differently, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Center*, 509 U.S. at 511, 113 S.Ct. 2742. *See also Dominguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 431 (1st Cir.2000)(reversing district court's decision to allow summary judgment motion when evidence was sufficient for jury to infer that employer's claimed reasons were pretextual and decision was result of discriminatory animus). The Supreme Court also confirmed that in employment law, as in criminal law, "the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097, *quoting Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992).

The logic of this authority applies with special force to this case. As noted, defendants' explanations for the delay of Powell's reinstatement, particularly the explanations offered by Alexander, were not credible. This was particularly troubling because, as the Court noted in *Reeves,* "the employer [wa]s in the best position to put forth the actual reason for its decision." 530 U.S. at 147, 120 S.Ct. 2097.

Of course, this finding of mendacity does not *compel* a verdict for Powell, or even a finding that Powell's First Amendment activity was "a" substantial or motivating factor in defendants' conduct. It is clear "that even if the trier of fact disbelieves the nondiscriminatory explanation given by the employer, the trier is not compelled to find that the real reason was discrimination." *Zapata–Matos v. Reckitt & Colman, Inc.,* 277 F.3d 40, 45 (1st Cir.2002). "[T]he ultimate question is not whether the explanation was false," *id.,* but whether Powell's prior lawsuit was a substantial or motivating factor. Powell must convince the court as factfinder that his First Amendment activities were "the real reason" for the delay. *St. Mary's Honor Center,* 509 U.S. at 515, 113 S.Ct. 2742. "It is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation . . . ." *Id.* at 519, 113 S.Ct. 2742 (emphasis in original).

■ Having heard the witnesses and weighed the evidence, this court concludes, as the finder of fact, that Powell has shown by a preponderance of the evidence that his prior lawsuit was a substantial, motivating factor in the defendants' decision to delay and obstruct his reinstatement. Put differently, but for the 1991 lawsuit and 1993 settlement, and the resent they engendered, Powell would have been promptly reinstated. In addition to suing the former Mayor, Powell sued police officers, and this fact made him distinctly unpopular with some officers. Powell's 1991 complaint charged Captain Boyer with using grossly racist language. Reilly believed that the litigation was divisive to the City.

Some police officers had "hard feelings" against Powell as a result of the 1991 lawsuit, and made these feelings known to Chief Lee, Alexander, and Reilly. Chief Lee admitted that if Powell had retired, it would have "solved a lot of problems." Alexander and Reilly also knew that if Powell was reinstated and thereafter filed another lawsuit, they would have to deal with it.

Other factors are relevant. First, the delay was temporally proximate to Powell's lawsuits. *See Acevedo–Diaz v. Aponte,* 1 F.3d 62, 69 (1st Cir.1993) (temporal proximity relevant but not sufficient); *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3d. Cir.1997)(noting cases have focused on temporal proximity when addressing issue of causal link); *Murphy v. Lane,* 833 F.2d 106, 107 (7th Cir.1987) (same). The Settlement Agreement obviously came shortly before defendants began placing obstacles in the path of reinstatement.

Second, there was evidence of disparate treatment and a departure from normal procedures. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 267, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role."); *Housing Works, Inc. v. City of New York,* 72 F.Supp.2d 402, 424 (S.D.N.Y.1999) ("Evidence that defendants acted toward plaintiff disparately from the manner in which defendants acted toward others may serve as circumstantial evidence of retaliation."); *Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 451 (Tex.1996)(noting that failure to adhere to established policies is circumstantial evidence of retaliation). Under the Revised

Interim Medical Guidelines, Powell should have gone before the Medical Review Board "within a reasonable time" after Dr. Bird initially determined that Powell had a potentially disqualifying position. Under the Guidelines, "[t]he Medical Review Board may except candidates from these Medical Guidelines, in whole or in part, consistent with the principle of Bona Fide Occupational Qualification . . . ." Dr. Bird sent his disqualifying letter to the personnel department at City Hall on December 21, 1993, and that letter was put in Alexander's hands. However, despite the Guideline's requirement, Alexander never submitted Powell's medical documentation to the Criminal Justice Training Council, and Powell lost the opportunity to appear before the Medical Review Board. Alexander's protest that she was not familiar with the Guidelines was not credible. Her determination to block Powell's reinstatement with the medical pretext was confirmed when she ordered Dr. Bird to keep his letter of July 5, 1994 confirming Powell's fitness for reinstatement secret.

Third, the circumstances surrounding Powell's delayed reinstatement evidenced a "pattern of antagonism." *See Kachmar v. SunGard Data Sys. Inc.,* 109 F.3d 173, 177 (3d Cir.1997) ("circumstantial evidence of 'pattern of antagonism' following protected conduct can also give rise to the inference."); *Housing Works v. City of New York,* 72 F.Supp.2d 402, 426 (S.D.N.Y.1999) (same). As noted in the findings of fact above, examples of antagonism abounded. Mention of a few will suffice here: The "2 job rule" was discussed in relation to Powell in May of 1994, but not raised with Powell until May of 1995. Alexander suppressed the July 5th letter and forbade Dr. Bird from talking to Powell about the letter. Alexander deliberately implied in a letter to Gogel that there was an agreement to "hold off" on Dr. Bird's report when there was no such agreement. Dr. Bird was, in fact, never asked to hold off on his report, and Alexander was in possession of the very report she was claiming that the doctor should "hold off" rendering.

Given all this, Powell has met his burden under *Mt. Healthy* and shown by a preponderance of the evidence that his previous recourse to this court in 1991 was a substantial or motivating factor—indeed it was the predominant factor—behind the delay and obstruction of his reinstatement.

### b. *Mt. Healthy Defense*

■ As noted, defendants may avoid liability if they prove by a preponderance of the evidence that Powell's reinstatement would have been delayed even if there had been no hostility over his prior lawsuits. Defendants have not met this burden. Defendants claim that they did not reinstate Powell in 1994 because of the agreement to "hold off" on Dr. Bird's report.

The point has perhaps been belabored excessively. As Powell, Gogel, and Dr. Bird credibly testified, *there was no agreement to "hold off" on Dr. Bird's report.* Had Powell been informed that he had been cleared medically by Dr. Bird or by the Medical Review Board, he would have eagerly returned to work. Defendants were contractually obligated to reinstate Powell. If Powell had not previously exercised his First Amendment right to seek redress in the courts and thereby generated hostility in the police department, Powell assuredly would have been reinstated without undue delay. This issue is not even close.

Therefore, plaintiff has proved by a preponderance of the evidence that defendants retaliated against him, at least in part, because he engaged in constitutionally protected conduct. In so doing, defendants violated 42 U.S.C. § 1983. The court will order the entry of judgment in Powell's favor on Count II.

### 3. § 1985(2)

To satisfy 42 U.S.C. § 1985(2), Powell must prove that Reilly and Alexander agreed to delay or prevent his reinstatement "because [he] previously had instituted legal actions to vindicate [his] federal rights." *Irizarry v. Quiros*, 722 F.2d 869, 871 (1st Cir.1983).[5] The Supreme Court made it clear in *Haddle v. Garrison*, 525 U.S. 121, 119 S.Ct. 489, 142 L.Ed.2d 502 (1998), that § 1985(2) recognizes a loss of employment as an "injur[y] in his person or property." *Id.* at 125–126, 119 S.Ct. 489. In *Irizarry*, the First Circuit held that an agreement to retaliate against a person for his having instituted legal actions to vindicate federal rights is cognizable under § 1985(2). 722 F.2d at 871.

■ Powell has shown by a preponderance of the evidence that Alexander and Reilly entered into such an agreement. The evidence showed that Alexander, Reilly, and Lee met on November 10, 1993, the same day that Dr. Bird found that Powell had hepatitis C. At this meeting, Reilly, Alexander, and Chief Lee agreed to steer Powell towards disability retirement because of bad feelings at the department arising from Powell's earlier lawsuit. Alexander's notes reflect that Reilly asked if they could retire Powell "involuntarily," and whether Powell had a "disabling condition." Chief Lee confirmed in his testimony that around the time of the first physical, the issue of disability retirement came

up. As the they saw it, if Powell retired, it would have "solved a lot of problems."

The same day that Dr. Bird received Dr. Borhan–Manesh's report indicating that Powell could return to work, Alexander again spoke to Chief Lee about whether Powell might be eligible for ordinary disability retirement. Two days later on May 11, 1994, Reilly, Alexander, and Chief Lee met to discuss Powell again. The evidence shows that the group again determined to pursue disability retirement for Powell, despite the fact that they had conclusive medical evidence that Powell was fit to return to work. They also decided at that meeting that the "2 job rule" offered an alternative roadblock to Powell's reinstatement, as Alexander's notes reflect. By the time of the meeting, Alexander had researched the ADA, and Chief Lee had called the Public Employee's Retirement Association. The court finds that they were determined to keep Powell from returning to work because of hostility in the department over Powell's prior lawsuits. Alexander carried out the plan discussed at that meeting throughout the summer of 1994.

By November, 1994, Alexander reported to Reilly that Powell was pursuing disability retirement but could not get a doctor to sign his disability form. On November 14, 1994, Reilly told Alexander to talk to Gogel about "finding a doctor who will say what [Powell] wants." Alexander's telephone

---

**5.** Section 1985(2) proscribes the following conspiracies: "If two or more persons conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of

any verdict, presentment, or indictment lawfully assented to by him, or of this being or having been such juror; or if two or more persons conspire for the purposes of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws."

notes reflect this comment, as well as her own enthusiastic observation: "great solution!"

By the spring of 1995 it became clear that disability retirement was not an option. When Powell pursued reinstatement with a new attorney and renewed vigor, Alexander brought up the "2 job rule" in just the manner that had been contemplated in May of 1994.

To be clear, the finding that Powell proved his § 1985(2) conspiracy claim against Reilly should not be taken to mean that the court found Reilly's denial of personal animus not credible. Reilly's testimony that he bore Powell no personal animus, and his testimony that he even approved of Powell's 1991 lawsuit was, in fact, credible.

However, the evidence also showed that Reilly was aware of the ill feelings harbored against Powell by some members of the police department. The preponderance of the evidence suggests that Reilly saw himself as not retaliating against Powell, but as achieving a solution to a divisive problem in Pittsfield. Some police officers did not welcome Powell's return because of the prior suit. If Powell could be put on disability retirement, Powell could, with another job, earn a comfortable living. Reilly may have thought that everyone, including Powell, would be better off if Powell did not come back to the force. However, in choosing this path, Reilly necessarily joined in the pattern of conduct designed to deprive Powell of his reinstatement *because of* Powell's recourse to the courts. Section 1985(2) does not require that the conspirator have personal animus; it requires only that the conspirators agree to injure a person "because of" his assertion of rights in federal court. The evidence demonstrates that, more likely than not, the Mayor, the City's Solicitor, and the Chief of Police worked in tandem to violate 42 U.S.C. § 1985(2).

## B. *REHABILITATION ACT*

Under the Rehabilitation Act, Powell must prove (1) that he was a "qualified individual with a disability"; (2) that Pittsfield received federal funds; and (3) that the delay in his reinstatement was caused in whole or in part by his disability. 29 U.S.C. § 794.

### 1. *Disability*

Regarding Powell's status as a "qualified individual with a disability," 29 U.S.C. § 794(a), defendants do not seriously dispute, and the court has no trouble finding, that Powell was "qualified" to do the work of a police officer within the meaning of the Rehabilitation Act. All of the medical evidence supports this conclusion, and the question does not merit further discussion. The sole question on this element of the Rehabilitation Act count is whether Powell was "disabled" within the meaning of the Rehabilitation Act.

The standards defining a disability under the Rehabilitation Act and the ADA are identical. On the facts of this case, in order to recover, Powell must show either that he had (1) a "physical impairment" which "substantially limited" one or more "major life activities;" or that he was (2) "regarded as having such an impairment." 29 U.S.C. § 705(20).

#### a. *Major Life Activity*

There is no doubt that hepatitis C is a "physical impairment." The question is whether hepatitis C "substantially limited Powell in a major life activity," or whether Pittsfield "regarded" Powell as having such a condition.

Powell was obviously not substantially limited in the major life activity of working. Powell could work as a police officer without accommodation and does not argue otherwise. *See Ellis v. Mohenis Servs. Inc.*, No. 96–6307, 1998 WL 564478, at *4

(E.D.Pa. August 24, 1998)(holding that plaintiff with hepatitis C was not substantially limited in major life activity of working); *Pimentel v. City of New York,* No. 00–0326, 2001 WL 1579553, at *12 (S.D.N.Y. December 11, 2001)(same).

Even where hepatitis C does not restrict an individual's ability to work, however, courts have repeatedly found that the disease substantially limits a major life activity because of its impairment of the individual's reproductive and sexual activity. The Supreme Court has recently held, in addressing the issue in the context of an HIV-positive plaintiff, that "reproduction is a major life activity for the purposes of the ADA." *Bragdon v. Abbott,* 524 U.S. 624, 639, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). According to the Court, a woman who was HIV-positive was "substantially limited" in her ability to reproduce in "two independent ways." 524 U.S. at 639, 118 S.Ct. 2196. First, she "imposes on the man a significant risk of becoming infected." *Id.* Second, she "risks infecting her child during gestation and childbirth." *Id.* at 640, 118 S.Ct. 2196. Although the court did not precisely quantify the risk that was necessary to count as a "substantial limitation," it noted that a risk of 8% was sufficient when the disease was "dread and fatal." *Id.* at 641, 118 S.Ct. 2196.

Very recently in the case, *Chevron U.S.A., Inc. v. Echazabal,* —— U.S. ——, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002), the defendant Chevron conceded that the plaintiff's hepatitis C was a "disability." *Id.* at 2048 n. 2. Moreover, following *Bragdon,* courts have had little trouble finding that "sexual relations" is also a major life activity. In *McAlindin v. County of San Diego,* 192 F.3d 1226 (9th Cir.1999), the Court of Appeals for the Ninth Circuit concluded that "engaging in sexual relations, just like procreation, is a major life activity.... [S]exuality is important in how 'we define ourselves and how we are perceived by others' and is a fundamental part of how we bond in intimate relationships." *Id.* at 1234, *quoting EEOC v. R.J. Gallagher Co.,* 181 F.3d 645, 654 (5th Cir. 1999). *See also Saunders v. Webber Oil Co.,* No. 99–246, 2000 WL 1781835, at *6 (D.Me. November 17, 2000)(finding that sexual relations is major life activity and noting, "[t]hat engaging in normal sexual relations is of relatively great importance to the vast majority of the population requires only the application of common sense."); *Harris v. Thigpen,* 941 F.2d 1495, 1522–1523 (11th Cir.1991)(holding that HIV-positive plaintiff was "handicapped" for purposes of the Rehabilitation Act); *Lesley v. Hee Man Chie,* 250 F.3d 47, 53 (1st Cir.2001)(noting parties did not dispute that "[plaintiff's] HIV-positive status is a disability for purposes of the [Rehabilitation] Act."). Both reproduction and sexual relations are obviously major life activities.

Given limitations on sexual and reproductive activity, most courts have found plaintiffs with hepatitis C to be "disabled" within the meaning of the ADA or the Rehabilitation Act. *See Quick v. Tripp, Scott, Conklin & Smith, P.A.,* 43 F.Supp.2d 1357, 1368 (S.D.Fla.1999)(holding that *Bragdon* "compels the conclusion that [plaintiff's] assertion that the significant limitations placed on her major life activity of reproduction due to the hepatitis C virus, qualifies as a recognized ADA disability."); *White v. Bank of America Corp.,* No. 99–2329, 2000 WL 1664162, at *4 (N.D.Tex. November 2, 2000)(holding that plaintiff's hepatitis C was disability because "[h]ere, as in *Bragdon,* if [plaintiff] attempts to conceive a child, he may infect his partner with the virus."); *Rollf v. Interim Personnel, Inc.,* No. 99–44, 1999 WL 1095768, at *3–4 (E.D.Mo. November 4, 1999)(holding that plaintiff survived motion to dismiss since he was substantially limited in major life activity of reproduc-

tion, and finding "if he were to attempt to conceive a child, he would impose a significant risk of infection on the woman with whom he attempted such conception, because hepatitis C is transmitted through blood transfusions and sexual intercourse."). *Cf. Clark v. Peco, Inc.,* No. 97–737, 1999 WL 398012, at *1 (D.Or. April 16, 1999) (upholding jury verdict that hepatitis C plaintiff was "perceived as" being disabled by employer).[6]

■ It is clear that Powell's hepatitis C "substantially limited" a "major life activity." As noted, the oral testimony from Drs. Ross and Bird, and the written report of Dr. Wasser, showed that hepatitis C was transmitted through sexual activity and the exchange of bodily fluids, although the risk was articulated as "low." The medical evidence also showed that hepatitis C causes cirrhosis, liver failure, cancer, and death. Thus, if Powell engaged in sexual relations with his wife for purposes of reproduction or marital intimacy,[7] he ran a risk of infecting her with a deadly disease. This unquestionably "substantially limited" him in a "major life activity." The evidence showed that Powell could not choose to be intimate with his wife without running the risk of endangering her life. Put differently, Powell's hepatitis C "significant[ly] restrict[ed] the ... manner or condition under which" Powell could engage in reproduction or sexual relations "as compared to the average person in the general population's ability to perform that same major life activity." 29 C.F.R. § 1630.2(j). Therefore, Powell proved by a preponderance of the evidence that he

was "disabled" within the meaning of the Rehabilitation Act.

### b. Regarded As

The evidence that Powell suffered a physical impairment that "substantially limited" a major life activity satisfies the first element of his claim under the Rehabilitation Act. It is therefore superfluous to address plaintiff's alternative argument that he was at any rate "regarded as" having such an impairment. Certainly, the testimony at trial made it abundantly clear that the defendants grossly overreacted, or at least made a show of overreacting, to the news that Powell had hepatitis C and failed, in the words of the Supreme Court, to "respond rationally" to his condition. *School Bd. of Nassau Cty. v. Arline,* 480 U.S. 273, 286, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987).

The alternative "regarded as" argument is complicated in two ways. First, the Court of Appeals has made it clear that "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Tardie v. Rehabilitation Hospital of Rhode Island,* 168 F.3d 538, 542 (1st Cir.1999). The bias expressed by City officials was largely limited to expressed concerns about Powell's ability to act as a police officer, not about any general lack of fitness for employment. Second, the evidence is inconsistent as to whether the defendants truly did "regard" Powell as disabled at all, but only seized the opportunity provided by his diagnosis as a handy, initial pretext for delaying his rein-

---

**6.** However, some courts have found hepatitis C plaintiffs to be not disabled. *See Reese v. American Food Service,* No. 99–1741, 2000 WL 1470212, at *6 (E.D.Pa. September 29, 2000)(allowing summary judgment against hepatitis C plaintiff when lack of evidence that plaintiff's reproduction or sexual activity was substantially limited); *Qualls v. Lack's*

*Stores,* Inc., No. 98–149, 1999 WL 731758, at *2 (N.D.Tex. March 31, 1999)(allowing summary judgment against hepatitis C plaintiff after finding that sexual intercourse was not major life activity).

**7.** Powell testified that at the time of trial, he had children ages 30, 25, 24, 21, and 2.

statement. A powerful response to these arguments is the evidence that defendants' excessive concerns about plaintiff's contagiousness reflected precisely the sort of irrational prejudice the Rehabilitation Act was designed to protect against. In any event, as noted, it is not necessary to enter this tangled thicket in view of the court's prior finding.[8]

## 2. *Federal Financial Assistance*

Powell must also prove that Pittsfield received federal financial assistance. 29 U.S.C. § 794(a). This requirement is satisfied by stipulation.

## 3. *"Solely by Reason Of"*

The final element is causation. Subdivision (a) of section 794 indicates that a violation occurs when a qualified individual is discriminated against "solely by reason of his or her disability." *Id.* Some controversy surrounds the provision's use of the term "solely." If applied to Powell, this term would preclude his claim because, as noted, Powell's recourse to the courts has already been established as the predominant motivating factor in delaying his reinstatement.

However, whether the "sole causation test" should be applied to Powell's claim is not straightforward. The First Circuit explicitly left open the question of the test's applicability in *Leary v. Dalton*, 58 F.3d 748, 752 (1st Cir.1995)("We therefore regard the applicability of Section 504 [of the Rehabilitation Act] and its sole causation test in this federal employment suit as an open question, but one that we need not reach here.").

In fact, as another district court has noted, "recent amendments to the Rehabil-

itation Act appear to suggest that the ADA standard should now apply to the Rehabilitation Act . . . ." *El Kouni v. Trustees of Boston University*, 169 F.Supp.2d 1, 3 n. 1 (D.Mass.2001). The Americans with Disabilities Act of 1990 does *not* employ the sole causation test. In enacting the ADA, Congress explicitly opted for a less stringent standard and explained its reasoning in the following excerpt from the House Committee Report:

The Committee recognizes that the phrasing of section 202 in this legislation differs from section 504 by virtue of the fact that the phrase "solely by reason of his or her handicap" has been deleted. The deletion of this phrase is supported by the experience of the executive agencies charged with implementing section 504. The regulations issued by most executive agencies use the exact language set out in section 202 in lieu of the language included in the section 504 statute.

A literal reliance on the phrase "solely by reason of his or her handicap" leads to absurd results. For example, assume that an employee is black and has a disability and that he needs a reasonable accommodation that, if provided, will enable him to perform the job for which he is applying. He is a qualified applicant. Nevertheless, the employer rejects the applicant because he is black and because he has a disability.

In this case, the employer did not refuse to hire the individual solely on the basis of his disability—the employer refused to hire him because of his disability and because he was black. Although the applicant might have a claim

---

8. Indeed, in a more general sense, the whole discussion of the Rehabilitation Act may be viewed as superfluous, since the damages to be awarded for the violations of § 1983 and § 1985(2) duplicate the damages under the

Act. In other words, even if plaintiff had not prevailed on the Rehabilitation Act count, the court would award precisely the same damages.

of race discrimination under title VII of the Civil Rights Act, it could be argued that he would not have a claim under section 504 because the failure to hire was not based solely on his disability and as a result he would not be entitled to a reasonable accommodation.

The Committee, by adopting the language used in regulations issued by the executive agencies, rejects the result described above. Court cases interpreting section 504 have also rejected such reasoning.

H.R. REP. No. 101–485(II), at 85 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 385. Thus, Congress voiced its disapproval of a literal reliance on the word "solely" in the Rehabilitation Act, and approved of court decisions rejecting what it termed the "absurd" interpretation of the Rehabilitation Act.

■ The 1992 amendments to the Rehabilitation Act gave statutory voice to this view. Specifically, Congress amended the Rehabilitation Act to include subdivision (d), which provided that,

> The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment.

29 U.S.C. § 794. An accompanying Senate Report made it clear that one purpose of the 1992 amendments was "to ensure that the precepts and values embedded in the Americans with Disabilities Act are reflected in the Rehabilitation Act of 1973." S. REP. NO. 102–357, at 2 (1990), *reprinted in* 1992 U.S.C.C.A.N. 3712, 3713. Thus, in the employment discrimination

context, a violation of the ADA also constitutes a violation of the Rehabilitation Act. *See Stewart v. United States,* No. C–99–4058 JCS, 2000 WL 1705657, at *4 (N.D.Cal. October 10, 2000)(rejecting sole causation test in federal employment context); *but see Soledad v. United States Dept. of Treasury,* 116 F.Supp.2d 790, 798 (W.D.Tex.2000)(holding that federal employee must prove that disability was sole cause of discrimination).

It is important to note that subdivision (d) of the 1992 amendments to the Rehabilitation Act applies only to "a complaint alleging employment discrimination." Accordingly, in *Lesley v. Chie,* 250 F.3d 47, the First Circuit applied the "sole causation test" to a pregnant HIV-positive plaintiff's claim that her doctor wrongly transferred her to an undesirable hospital. *Id.* at 53. In that case, the standards of the ADA were not applicable because the complaint at issue was not one "alleging employment discrimination," as specified by subdivision (d).

■ Given these developments, Powell must show by a preponderance of the evidence that his reinstatement was delayed "in whole or in part because of [his] disability." *Equal Employment Opportunity Comm'n v. Amego, Inc.,* 110 F.3d 135, 141 n. 2 (1st Cir.1997). There was a mountain of evidence at trial that Powell's hepatitis C caused the delay in his return to work, at least in part. Most importantly, Alexander said over and over that Powell's medical condition was preventing his reinstatement. Gogel testified that the entire time he dealt with her, Alexander relied on Dr. Bird's initial report diagnosing Powell with hepatitis C to resist reinstatement. According to Gogel, Alexander always indicated that it was Powell's health problem that was keeping him from being reinstated.

Gogel's perception that hepatitis C was the obstacle to Powell's reinstatement was borne out by Alexander's letters. On May 12, 1994, Alexander wrote to Gogel and stated that Powell "has not yet succeeded in passing the physical examination," and concluded by stating that, "if the City physician is satisfied that Mr. Powell may safely return to work ... Mayor Reilly will then ... make a determination, along with Chief Lee, in regard to reinstatement." Alexander noted Powell's medical condition in her June 30, 1994 letter responding to Attorney Nardi's demand that Powell be reinstated. It came up again in her September 20, 1994 letter when she wrote, "no one anticipated that [Powell] would have a health problem which would impede the reinstatement." Again on November 22, 1994, Alexander wrote that "we should discuss the possibility of [Powell's] returning to the Police Department if medically permitted." This, along with the other evidence submitted at trial, is more than sufficient to establish causation.

The fact that defendants were motivated to keep Powell from being reinstated by his exercise of his First Amendment rights and the resentment it may have caused in some members of the police department does not preclude liability under the Rehabilitation Act. Defendants unquestionably *used* Powell's hepatitis C to delay his reinstatement. Under the Rehabilitation Act, this is impermissible. Powell has proved *both* that Pittsfield delayed his reinstatement in part because of his disability *and* that his recourse to the courts was a substantial or motivating factor for Pittsfield. In this case, Powell's hepatitis C provided convenient fodder for the retaliation. By using Powell's disability to keep him out of work, defendants violated the Rehabilitation Act on the way to violating Powell's First Amendment rights. Under the circumstances, Powell may rightfully claim that defendants should be "hoist with their own petar." WILLIAM SHAKESPEARE, HAMLET, act 3, sc. 4.

## C. *BREACH OF CONTRACT*

Powell's breach of contract claim presents the easiest issue. Under the Settlement Agreement, Pittsfield agreed to reinstate Powell. The question presented is whether Pittsfield breached its implied duty of good faith and fair dealing under the contract. The parties agree that,

> Every contract implies good faith and fair dealing between the parties to it. The implied covenant of good faith and fair dealing provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

*Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 471, 583 N.E.2d 806 (1991)(quotations and citation omitted). *See also James L. Miniter Ins. Agency, Inc. v. Ohio Indemnity Co.,* 112 F.3d 1240, 1249 (1st Cir.1997). Powell argues that Pittsfield breached this fundamental duty.

The court has no trouble finding that, no later than February 1, 1994, Pittsfield breached the Settlement Agreement. It was perhaps reasonable for Dr. Bird to ask that Powell see Dr. Wasser, and arguably understandable that Dr. Bird initially disqualified Powell in his December 21, 1993 letter. At the time, Dr. Bird believed that active hepatitis was a disqualifying condition. However, it was plainly Pittsfield's duty to then send Powell's medical documentation to the Criminal Justice Training Council. From there, the issue of Powell's eligibility would have proceeded from the Prescreening Coordinator to the Medical Review Board, which would almost certainly have "except[ed] [Powell] from these Medical Guidelines ... consistent with the principle of Bona Fide Occupational Qualification ...." Pittsfield was in breach of the contract when Alexander

blocked Powell's ability to enter this normal process.

Any argument that Pittsfield did not breach the contract until it received the results of the liver biopsy is foreclosed by two facts. First, no doctor told Pittsfield that a liver biopsy was relevant to Powell's employability; a liver biopsy was plainly relevant only to the issue of whether Powell needed treatment. Second, Pittsfield demonstrated, by its actions in June and July of 1994, that it was determined to keep Powell out of work, whatever the results of the biopsy.

Thus, Pittsfield breached the Settlement Agreement when it failed to send Powell's medical documentation to the Criminal Justice Training Council. The latest reasonable date for it to have done this would have been February 1, 1994, six weeks after Dr. Bird submitted his December 21, 1993 disqualification letter.

### D. *Damages*

#### 1. *Compensatory Damages*

Defendants who act jointly, as in this case, are liable for one total sum. *See, e.g., Hall v. Ochs,* 817 F.2d 920, 926 (1st Cir.1987). The task, then, is to determine the total amount of Powell's actual damages. As noted, Powell has shown by a preponderance of the evidence that Pittsfield breached the Settlement Agreement no later than February 1, 1994.

▮ Powell's lost wages must be calculated from February 1, 1994, until May 20, 1996. At trial, Powell proffered that his salary during this time would have been at least $60,000 annually, or $1,153.85 weekly. This suggestion was supported by the evidence. Powell earned $57,195 in 1997 working the day shift, and credibly testified that he would have worked the eve-

ning shift from 1994 until 1996, as was his normal practice. The evening shift paid 10% more than the day shift, and would have converted $57,195.00 into $62,914.50. Therefore, Powell proved by a preponderance of the evidence that he would have earned at least $60,000 annually, or $1,153.85 weekly. Since Powell missed 48 weeks in 1994, 52 weeks in 1995, and 20 weeks in 1996, his lost wages amount to a total of $138,462.00 (120 weeks × $1,153.85/weekly). Powell was unable to provide documentation or clear testimony about his damages from lost benefits or retirement earnings, so the court will not supplement this figure to reflect any such losses.

Defendants argue that the total amount of lost wages should be offset by Powell's earnings, reported on his income tax returns, for the relevant period of time. First, defendants point out that Alexis Taxi reported $29,624 in gross receipts for fiscal year 1995. Powell argues that this amount should not count as mitigation because his taxi business lost money in 1995. In fact, the taxi business lost money overall from 1994 to 1996.

On this issue, Powell has the better argument. The Form 1120 that defendants have submitted shows that while Alexis Taxi did take in $29,624.00 in 1995 in revenues, it had expenses in the amount of $42,997.00. Thus, the business *lost* $13,373.00 in 1995, and had a net profit of "0."

▮ Defendants bear the burden of proof on the issue of mitigation of damages. *McKenna v. Commissioner of Mental Health,* 347 Mass. 674, 677, 199 N.E.2d 686 (1964). Obviously, they have not met that burden with regard to profits from the taxi business.[9] However, defendants

---

**9.** Powell has not shown, or attempted to show, that he should recover against defendants for the losses he suffered with his busi-

ness. *See, e.g., Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 485, 583 N.E.2d 806 (1991) (noting that plaintiff must

also point to Powell's earnings from the Kolburne School in the amount of $3,839.07 in 1995, and $7,721.70 in 1996, for a total of $11,560.77. These are properly considered, and should be offset against Powell's lost wages. Thus, Powell's total lost wages from February 1, 1994 until May 20, 1996 were $126,901.23 ($138,462.00 minus $11,560.77). The clerk will add interest to this amount at the rate of 12% per annum from the date of breach, February 1, 1994, as specified by Mass. Gen. Laws ch. 231, § 6C (2000).

 Plaintiff has also shown that he suffered substantial compensable emotional injury from his ordeal. For example, Powell testified that he was put through the humiliating experience of being forced to accept public assistance and to borrow money from his mother-in-law. As noted, Powell described the effect of being out of work as "devastating," and the emotion he showed at trial made this description credible. The stress manifested itself physically in the form of migraine headaches. To fairly compensate Powell for these emotional injuries, the court awards an additional $60,000.00.

2. *Punitive Damages*

 Powell has requested punitive damages against Alexander only. Punitive damages are "not favored in the law and are allowed only with caution and within normal limits." *McKinnon v. Kwong Wah Restaurant*, 83 F.3d 498, 508 (1st Cir. 1996). "There is no vested right to punitive damages on the part of the plaintiff and where allowed, they are awarded as a matter of public policy to punish outrageous conduct by the defendant or to deter similar conduct in the future." *Id.* Powell claims that this is one of those rare cases where punitive damages are appropriate, and the court agrees.

Alexander's actions in this case were both outrageous and reprehensible. To name just a few, Alexander failed to send Dr. Bird's original report to the Medical Review Board in violation of her legal duties. Alexander deliberately hid the July 5th, 1994 letter, which cleared Powell to go back to work, and pressured Dr. Bird to the point where he declined to communicate candidly with a patient of his who was suffering from a serious disease. Alexander methodically kept a stream of letters going to Powell and his counsel in an effort to mask her interference with his reinstatement, and went so far as to manufacture a nonexistent agreement that Dr. Bird "hold off" on his report on Powell's health. Finally, in her 1996 submissions to this court, Alexander left out all mention of the July 5th report. The report was not mentioned in Alexander's own affidavit or included among the forty-nine exhibits submitted in response to Powell's request to re-open the case. Worse, Alexander forced a kind of fraud upon Dr. Bird when she left any reference to the letter out of his affidavit, which she drafted.

In short, Alexander "engaged in a course of behavior" that this court deems to be "outrageous and worthy of condemnation." *Zimmerman v. Direct Federal Credit Union*, 262 F.3d 70, 84 (1st Cir. 2001). Alexander's notes reflect that she was aware that her actions violated federal law, and thus she "acted in the face of a perceived risk that [her] actions [would] violate federal law." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). Alexander may have seen herself as a vigorous advocate representing the interests of the Pittsfield police department, but her actions were especially unworthy of a City

show that expenses were "reasonable" in order to recover). However, those losses obviously may be considered on the issue of mitigation.

Solicitor. Punitive damages in the amount of $10,000.00 will be awarded.

### 3. *Attorney's Fees and Costs*

Plaintiff is entitled to reasonable attorney's fees under 42 U.S.C. § 1988(b) and 29 U.S.C. § 794a(b). A judgment on this issue must await further submissions.

### IV. *CONCLUSION*

For the reasons set forth above, the court will enter judgment for plaintiff on Count II against defendants Pittsfield, Alexander and Reilly, insofar as it alleges retaliation on the basis of First Amendment activity; on Count III against defendant Pittsfield; on Count IV against defendants Alexander and Reilly; and on Count V against defendant Pittsfield. The clerk will calculate the interest on $126,901.23, at 12% per annum, from February 1, 1994. The total lost wages plus interest will then be added to the $60,000 awarded for emotional distress. Finally, a separate judgment, in addition to the above, will be entered against the defendant Alexander in the amount of $10,000 in punitive damages.

Counsel for plaintiff will have thirty days from the date of this order to submit a memorandum and supporting affidavit specifying the reasonable fees and costs to be awarded, with contemporaneous time records. Counsel for defendants will have thirty days to respond. The court will retain the case until this issue is disposed of.